## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| A.R., on behalf of a class of those similarly situated, | |
| Plaintiff, | 3:16-cv-01197 (CSH) |
| v. | |
| CONNECTICUT STATE BOARD OF EDUCATION, | **June 10, 2020** |
| Defendant. | |

### RULING ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge**:

Plaintiffs, individuals with disabilities, bring this class action against Connecticut State Board of Education, alleging that the Board's enforcement of age limitations on special education established by Conn. Gen. Stat. § 10-76d(b) and Conn. Agencies Reg. § 10-76d-1(a)(4) violates the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1412(a). This Ruling resolves the parties' cross-motions for summary judgment.

### I.  BACKGROUND

A detailed background of this case and an account of Plaintiff A.R.'s individual circumstances appear in this Court's previous Class Certification Ruling, 2020 WL 2092650 (May 1, 2020), familiarity with which is assumed, and are recounted herein only to the extent necessary to explain this Ruling.

Plaintiffs are individuals with disabilities who were or are provided with special education under the IDEA by Defendant Connecticut State Board of Education ("the Board"), an agency

1

responsible for general supervision and control of elementary and secondary education, special education, and adult education in the State of Connecticut. *See* Conn. Gen. Stat. § 10-4(a). The Board is also responsible for ensuring Connecticut's compliance with the IDEA requirements regarding the provision of special education. *See* 20 U.S.C. § 1412(11) (the state educational agency is responsible for ensuring that the IDEA's requirements are met); and 20 U.S.C. § 1407 (each state receiving federal funds must ensure that its laws and policies comply with the IDEA's requirements).

The plaintiff class[1] in this action is defined as follows:

All individuals who were over 21 and under 22 within two years before the filing of this action or will turn 21 during the pendency of this action who are provided or were provided a [free appropriate public education] under the IDEA by any [Local Education Agency] in the State of Connecticut and who, but for turning 21, would otherwise qualify or would have qualified for a [free appropriate public education] until age 22 because they have not or had not yet earned a regular high school diploma ("the Class"). *See* May 1, 2020 Class Certification Ruling, 2020 WL 2092650.

Plaintiffs now move for summary judgment. Plaintiffs challenge the Board's enforcement of age limitations to special education established by Connecticut's statute and regulations, which provide that an individual with a disability, who turns 21 during the school year, is entitled to receive special education only until the end of that school year. *See* Conn. Gen. Stat. § 10-76d(b); Conn. Agencies Reg. § 10-76d-1(a)(4). Plaintiffs argue that the Board's failure to provide special education to individuals with disabilities between the ages of 21 and 22 violates the IDEA because the Board provides public education to non-disabled individuals in that age range through adult education programs that allow their students to earn high school diplomas. *See* Pls.' Summ. J. Br., Doc. 29-1, at 1–2 ("Pls.' Summ. J. Br.") (citing 20 U.S.C. § 1412(a)(1)(B)).

---

[1] Plaintiffs' claims for class-wide injunctive and declaratory relief were certified under Rule 23(b)(2), and Plaintiffs' claims for compensatory education were certified under Rule 23(b)(3). *See* May 1, 2020 Class Certification Ruling, 2020 WL 2092650.

To remedy the Board's alleged failure to comply with the IDEA, the Class seeks the following injunctive and declaratory relief:

(a) Find and declare that the Board's current or future refusal to provide Plaintiff A.R. and the members of the Plaintiff Class with [a free and appropriate public education] on account of their age violates the IDEA;

(b) Find and declare that, by this conduct, the Board has violated 20 U.S.C. § 1407 and 20 U.S.C. § 1412(11);

(c) Find and declare that Conn. Gen. Stat. § 10-76d(b) and Conn. Agencies Reg.§ 10-76d-1(a)(4) are invalid as contrary to the IDEA;

(d) Enjoin the Board from terminating [a free and appropriate public education] as to Plaintiff A.R. and the members of the Plaintiff Class who have not yet turned 22;

(e) Award compensatory education to members of the Plaintiff Class to the extent they have already been denied [a free and appropriate public education] unlawfully.

Am. Compl. ¶ 51(a)–(e).

The Board cross-moves for summary judgment. The Board contends that its failure to provide special education to individuals with disabilities between the ages of 21 and 22 does not violate the IDEA because individuals over the age of 21 do not have a right to public education in Connecticut. *See* Def.'s Summ. J. Br., Doc. 38-1, at 16–17 ("Def.'s Summ. J. Br."). The Board maintains that, while many local educational agencies in Connecticut provide adult education programs for non-disabled individuals ages 21 and over, these programs do not constitute "public education" within the meaning of the IDEA. *See id.* at 17–18; Def.'s Local Rule 56(a)(2) Statement of Facts in Opp'n. to Pls.' Mot. Summ. J. ("DSFO"), Doc. 38-6, ¶ 1.[2]

---

[2] The parties submitted their briefing in support of cross-motions for summary judgment prior to the filing of the Amended Complaint, which substituted Plaintiff A.R. for former plaintiff D.J. The Court notes that, in light of the substitution, the parties' arguments regarding the standing and mootness of former plaintiff D.J.'s claim are no longer applicable. *See* May 1, 2020 Class Certification Opinion, 2020 WL 2092650, at *3–4. As to all other issues, however, "Plaintiff and Defendants agree that the existing briefing . . . is adequate for the Court to decide the issues

3

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment may be granted if the moving party shows that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986)).  Only disputes over facts that are material will preclude the entry of summary judgment.  *See id.*

A fact is material "if it might affect the outcome of the case under governing law."  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal citation omitted).  A material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256 (1986); *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).

To show that a material fact cannot be genuinely disputed, a moving party must "cit[e] to particular parts of materials in the record," including depositions, affidavits, declarations, stipulations, admissions, interrogatory answers, or other materials.  *See* Fed. R. Civ. P. 56(c)(1)(A).  If the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Scott*, 550 U.S. at 380.  The nonmoving party may not defeat a grant of summary judgment by "rest[ing] upon the mere allegations or denials

---

set forth therein despite the amended complaint" and maintain that "no further briefing is necessary."  *See* May 10, 2019 Stipulation, Doc. 65, at 2.

of [its] pleading"[3] or relying on "conclusory allegations or unsubstantiated speculation." *See F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998)).  Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *See Amaker*, 274 F.3d at 680–81 (citing Fed. R. Civ. P. 56(e)).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2017).  In making its determination, the court may consider the materials cited by the parties as well as "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

If the parties file cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  That principle applies to the case at bar, where the Plaintiff class and the Defendant Board cross-move for summary judgment.

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Barlow v. Connecticut*, 319 F. Supp. 2d 250, 260 (D. Conn. 2004) (citing *Anderson*, 477 U.S. at 247–48).

### B.  The IDEA Framework

A state receiving federal funds under the IDEA must provide "a free appropriate public

---

[3] *Amaker v. Foley*, 274 F.3d 677, 680–81 (2d Cir. 2001).

education"[4] to children with disabilities "between the ages of 3 and 21, *inclusive*."  *See* 20 U.S.C. § 1412(a)(1)(A) (emphasis added); 34 C.F.R. § 300.101(a); *see also* 20 U.S.C. § 1407 ("Each State that receives funds under this chapter shall—(1) ensure that any State rules, regulations, and policies relating to this chapter conform to the purposes of this chapter . . .").

Accordingly, under the IDEA, children with disabilities remain eligible to receive a free appropriate public education until they reach the age of 22.  *See Lillbask ex rel. Mauclaire v. State of Conn. Dep't. of Educ.*, 397 F.3d 77, 86 n.4 (2d Cir. 2005) ("We have interpreted the word 'inclusive,' in this provision, to indicate that a child remains eligible for a free appropriate education under IDEA until his 22nd birthday."); *St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 168–69 (2d Cir. 2001) ("If the word 'inclusive' is to mean something, as it must, it means that the relevant period begins on a child's third birthday and ends on the last day of his 21st year (which culminates in his 22nd birthday)."); *see also K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d 639, 641 (1st Cir. 2018) (the IDEA eligibility continues until a child with disability turns 22);  *L.A. Unified Sch. Dist. v. Garcia*, 669 F.3d 956, 959 (9th Cir. 2012) (children eligible to receive services under the IDEA "are entitled to continue receiving those services until they turn twenty-two").[5]

Nevertheless, the IDEA permits states to further limit age eligibility for a free appropriate public education under certain conditions.  *See* 20 U.S.C. § 1412(a)(1)(B).  A state need not provide a free appropriate public education to individuals with disabilities ages 18 to 21 if doing so would be

---

[4] A free appropriate public education (sometimes abbreviated as FAPE) is defined as special education and related services that "have been provided at public expense, under public supervision and direction, and without charge," "meet the standards of the State educational agency," "include an appropriate preschool, elementary school, or secondary school education in the State involved," and "are provided in conformity with the individualized education program."  *See* 20 U.S.C. § 1401(9).

[5] *But see Bd. of Educ. v. Illinois State Bd. Of Educ.*, 79 F.3d 654, 656 (7th Cir. 1996) ("the [IDEA] entitles disabled individuals to special education assistance only until they reach the age of 21").

"inconsistent with State law or practice" regarding "the provision of public education to children in those age ranges." *See* 20 U.S.C. § 1412(a)(1)(B)(i); 34 C.F.R. § 300.102(a)(1).

Interpreting this provision in light of the IDEA's legislative history, the Ninth Circuit and the First Circuit concluded that a state may deny a free appropriate public education to children with disabilities ages 18 through 21, inclusive, only if it denies "public education" to non-disabled individuals of the same age. *See K.L.*, 907 F.3d at 642;  *E.R.K. ex rel. R.K. v. Haw. Dep't of Educ.*, 728 F.3d 982, 986–87 (9th Cir. 2013) (quoting S. Rep. No. 94–168, 1975 U.S.C.C.A.N. 1425, 1442–43 (1975) (explaining that the state may not avail itself of the exception with respect to children with disabilities ages 18 through 21 "where a state does now in fact provide or assure the provision of free public education to non-handicapped children in these age groups")).

Accordingly, a state that provides "public education" for non-disabled individuals ages 18 through 21, inclusive, must also provide a free appropriate public education for individuals with disabilities in the same age range.  *See K.L.*, 907 F.3d at 642 (holding that Rhode Island Board of Education violated the IDEA by denying special education to individuals with disabilities ages 21 and over because Rhode Island provided public education programs to non-disabled individuals of the same age); *E.R.K.*, 728 F.3d at 987 (holding that Hawaii Department of Education violated the IDEA by denying special education to individuals with disabilities ages 20 through 21, inclusive, because Hawaii provided adult secondary education programs to non-disabled persons of the same age); *see also St. Johnsbury Acad.*, 240 F.3d at 169–70 (remarking that New York, unlike Vermont, was not required to provide special education to 21-year-old individuals with disabilities because New York law offered "public education" only to persons "under twenty-one years of age," while Vermont law did not specify an "upper age limit" on public education) (citing *Burr v. Ambach*, No. 86 Civ. 7164,

1987 WL 19957, at *1 (S.D.N.Y. Nov. 10, 1987)).

Under Connecticut law, an individual with a disability is entitled to receive special education until he or she "is graduated from high school or reaches age twenty-one, *whichever occurs first*." (emphasis added). That provision appears in Conn. Gen. Stat. § 10-76d(b), which is captioned "Duties and powers of boards of education to provide special education programs and services." An individual with a disability who turns 21 during the school year will continue to receive special education only until the end of that school year. *See* Conn. Agencies Reg. § 10-76d-1(a)(4).[6]

Plaintiffs argue that the Board's enforcement of this age limitation to special education violates the IDEA because Connecticut generally provides public education to non-disabled individuals ages 21 and over through adult education programs that allow their participants to earn high school diplomas. The Board, however, contends that adult education programs offered by the state's local educational agencies do not constitute "public education" because they significantly differ from education provided in Connecticut's public schools.

The proper resolution of the case at bar depends in large measure on an exercise in semantics. It is easy enough to recite the rule derived from the decisions in *E.R.K.* and *K.L.*: a board of education must provide *special education* to individuals with disabilities between the ages of 21 and 22 to the extent that the board also provides *public education* to non-disabled individuals of the same age. The difficult and decisive question is whether particular programs and services administered by a board of education fall within the phrase "public education." In that context, we must ask: (1) what constitutes "public education" under the IDEA; and (2) whether adult education programs offered in

---

[6] For purposes of this regulation, the school year runs from July 1 through June 30. Conn. Agencies Reg. § 10-76d-1(a)(4).

Connecticut qualify as such "public education."  I consider those questions in order.

### (1) "Public Education" under the IDEA

The term "public education" is not defined under the IDEA.  *See* 20 U.S.C. § 1401.  Nor has the Second Circuit examined this term.  In the absence of such guidance, a term should be given its ordinary, common-sense meaning.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000) (when Congress fails to define a term, the court must consider the term's "ordinary, common-sense meaning").  Apart from its ordinary meaning, a term must be interpreted according to "its placement and purpose in the statutory scheme."  *Dauray*, 215 F.3d at 261 (citing *Bailey v. United States*, 516 U.S. 137, 145 (1995) ("[T]he meaning of statutory language, plain or not, depends on context.")); *see Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (when interpreting terms, courts must "bear[] in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (internal quotation marks omitted).

Relying on these principles, the Ninth Circuit in *E.R.K. ex rel. R.K. v. Haw. Dep't of Educ.*, 728 F.3d 982  (9th Cir. 2013), and the First Circuit in *K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d 639 (1st Cir. 2018), provided helpful guidance regarding the interpretation of the term "public education" within the meaning of the IDEA when confronted with plaintiffs' challenges to, respectively, Hawaii's and Rhode Island's age limitations on special education.

To arrive at the definition of "public education," the Ninth Circuit looked at the related term expressly defined in the IDEA—"free appropriate public education."  *See E.R.K.*, 728 F.3d at 987–88.

The IDEA defines "free appropriate public education" as "special education and related services" that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

The Ninth Circuit reasoned that "[o]nce we strip out those aspects of the IDEA's definition of 'free appropriate public education' that clearly relate to the education's 'appropriateness,' as opposed to its 'free' and 'public' character, we are left with a reliable index of what 'free public education' means in § 1412(a)(1)(B)(I)." *See* 728 F.3d at 988. Observing that "an education can be both free and public even if it is inappropriate because it fails to meet state standards or to conform with an individualized education program," *E.R.K.* concluded that "public education" within the meaning of the IDEA "is one that is 1) provided at public expense, under public supervision and direction, and without charge; and 2) involves preschool, elementary, or secondary education." *Id.*

*E.R.K.* noted that the first prong of this definition is consistent with the ordinary, dictionary meaning of the term public education. *Id.* (citing Webster's Third New International Dictionary 1836 (1968) (A "public" institution is one that is "accessible . . . to all members of the community" and which "provid[es] services to the people . . . under some degree of civic or state control." ). *Id.* The second prong of the definition, *E.R.K.* explained, "is derived from the IDEA's limited scope"—"[b]ecause the IDEA applies only to preschool, elementary, or secondary education, *see* 20

U.S.C. § 1401(9), we do not think §1412(a)(1)(B)(i) refers to public education outside those same categories." *Id.*

Five years after the Ninth Circuit's decision in *E.R.K.*, the First Circuit in *K.L.* arrived at a substantially similar definition of "public education."[7] Focusing on the ordinary meaning of the term, supplied by multiple dictionaries, *K.L.* reasoned that "public education" must involve "(1) a significant level of state or local governmental funding, and (2) the public administration or oversight of the educational services." *See* 907 F.3d at 642–43 ("we find helpful the shared dictionary focus on state funding and a degree of state control for the confirmation it offers of our understanding of the ordinary meaning of 'public education'") (citing, *inter alia*, The Oxford English Dictionary 780 (2d ed. 1989) (defining "public" as "provided or supported at the public expense, and under public control: as in public elementary school")).

Additionally, *K.L.* concluded that, in light of the IDEA's statutory context, this ordinary understanding of "public education" must be supplemented with an additional attribute—"the objective of educating students up to the level of academic proficiency associated with the completion of secondary school." *Id.* at 644. *K.L.* reasoned that "public education" must be "limited to educational opportunities only through the academic level associated with completion of secondary school" based on the guidance provided by other provisions of the IDEA, including its definitions of the terms "free appropriate public education" and "transition services":

---

[7] Despite arriving at a substantially similar definition of "public education," the *K.L.* court declined to adopt the analysis employed by the Ninth Circuit: "We are unpersuaded by that analysis, which uses FAPE, a term of art that applies to 'special education and related services,' 20 U.S.C. § 1401(9), to define the general term 'public education.' We look to the FAPE definition only in the limited way noted above." 907 F.3d at 643 n.2. At the same time, however, *K.L.* found that its definition of "public education" is "consistent" with the IDEA's definition of "free appropriate public education" because "free appropriate public education" contemplated by the IDEA is "provided at public expense, under public supervision and direction." *Id.* at 643 (citing 20 U.S.C. § 1401(9)(A)).

For example, the IDEA defines a type of services called "transition services" as activities designed "to facilitate [a child with a disability's] movement from school to post-school activities, including post-secondary education[.]" 20 U.S.C. § 1401(34).  The definition of "transition services" implies that "public education" within the meaning of the IDEA includes only education up through a "secondary education."  Similarly, the IDEA defines [a free appropriate public education (FAPE)] as including "an appropriate preschool, elementary school, or secondary school education." 20 U.S.C. § 1401(9)(C).  Since providing "public education" triggers the FAPE requirement, it is logical that the two terms apply to the same levels of schooling.  We find further confirmation of this scope in the IDEA's statement of purpose, which likewise uses terminology commonly associated with secondary-level achievement: "educational outcomes," § 1400(c)(9), "educational results," § 1400(d)(3), and "graduation rates," § 1400(c)(14).

907 F.3d at 643–44.

In accordance with this analysis, *K.L.* concluded that "public education" must possess the following attributes: (1) a significant level of state or local governmental funding, (2) the public administration or oversight of the educational services, and (3) the objective of educating students up to the level of academic proficiency associated with the completion of secondary school." *Id.*

The First Circuit in *K.L.* and the Ninth Circuit in *E.R.K.* identified the same core characteristics of "public education" within the meaning of the IDEA: they concluded that such education must be provided at public expense, under public supervision, and be limited to preschool, elementary, or secondary educational services, rather than post-secondary or vocational training. *See id.*; *E.R.K.*, 728 F.3d at 988.  In resolving the present case, I find the reasoning of both *K.L.* and *E.R.K.* persuasive.  Adopting the collective guidance and analyses of those decisions, I hold that "public education," within the context of the IDEA, should be defined as one that is provided: (1) at public expense through significant state or local governmental funding; (2) under the administration, supervision or oversight of state educational agencies; and (3) with the objective of educating students up to the level of academic proficiency associated with the completion of secondary school. *See K.L.*,

12

907 F.3d at 644; *E.R.K.*, 728 F.3d at 988.

The Board contends that, for the purposes of this case, the term "public education" should be further limited to encompass only the education provided in state elementary and secondary public schools, rather than adult education programs. *See* Def.'s Summ. J. Br. at 14–16. The Board argues that the adult secondary school completion programs offered in Connecticut should not constitute "public education" because they are not provided through the public school system and are not subject to the same state standards regarding curriculum and instruction.[8] Def.'s Summ. J. Br. at 15–16, 18–19.

Defendant's position finds support in the dissenting opinion in *K.L.* authored by Judge Sandra L. Lynch, who argued that "public education" should not encompass adult education programs because the IDEA "only concerns instruction associated with public preschool, elementary, and secondary school." *See* 907 F.3d at 655 (Lynch, J., dissenting). Judge Lynch observed that the term "adult education" appears in the IDEA under the umbrella of "transition services,"[9] which are meant

---

[8] The Board also seeks to interpret the term "public education" in light of Connecticut state law. Citing to various provisions of Connecticut constitution and statutes, the Board argues that the term "public education" under Connecticut law refers only to education provided by public elementary and secondary schools. *See* Def.'s Summ. J. Br. at 14–16. For example, citing Article 8 Section I of the Connecticut Constitution, which states that "[t]here shall always be free public elementary and secondary schools in the state," the Board concludes that public education in Connecticut is synonymous with public school education. The Board's attempt to incorporate state law in the definition of "public education" under the IDEA is misguided. As stated by the First Circuit, state law should not play any role in determining the meaning of "public education" as used in § 1412(a)(1)(B)(i) of the IDEA, because "[t]hat section does not delegate the definition of 'public education' to the states." *K.L.*, 907 F.3d at 645. "Indeed, to allow each state to define 'public education' would not only result in fifty different interpretations of the IDEA, but it would also permit states to circumvent the FAPE requirement by characterizing any educational services they provide to students aged 18 through 21 as something other than 'public education.'" *Id.* The Court agrees with this analysis and declines to tailor the definition of "public education" to Connecticut law.

[9] "The term "transition services" means a coordinated set of activities for a child with a disability that—
(A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation . . ." 20

to help children advance from "school" to "post-school" activities. *See id.* at 655–56 (citing 20 U.S.C. § 1401(34)). Relying on this provision, Judge Lynch concluded that the IDEA classifies "adult education" as a "post-school activity," and that "school" must refer to traditional "[p]reschool, elementary school, and secondary school." *See id.* Reasoning that "[i]t was clearly not Congress's intent that 'post-school activities' would trigger the [free appropriate public education] requirement for disabled students in 'preschool, elementary school, or secondary school," Judge Lynch concluded that "adult education" cannot constitute "public education" within the meaning of the IDEA. *See id.* at 656. Thus, despite the fact that Rhode Island's adult education programs allowed non-disabled students to earn high school diplomas or high school equivalency diplomas, Judge Lynch concluded that such programs did not constitute "public education" under the IDEA because they were not offered through the state public school system and were not subject to the same curriculum or graduation requirements. *See id.* at 658–59 ("The fact that these programs help adult learners obtain high school diplomas or high school equivalency diplomas does not make them the functional equivalent of secondary school for purposes of the IDEA.").[10]

Judge Lynch dissented in a First Circuit opinion which is not binding on me. I may accept

---

U.S.C. § 1401(34).

[10] Judge Lynch's dissent also raised a concern regarding "the undeniable financial consequences" that would follow from requiring local school systems to extend special education to individuals with disabilities until the age of 22 so as to bring the state's special education program in line with its adult education program for non-disabled persons. *See K.L.*, 907 F.3d at 656–57 (Lynch, J., dissenting). However, as stated by *K.L.*'s majority: "the very purpose of the IDEA provision at issue here is to ensure equivalent educational opportunities for students with and without disabilities. It is simply not a response to the requirement of equality to say that students with disabilities may properly be afforded less education because equal treatment will be too costly." *Id.* at 652; *see also E.R.K.*, 728 F.3d at 992 (stating that, although "[Hawaii adult education] programs—unfettered by the obligation to address the needs of disabled students—are surely much cheaper to operate than a public-school system with a full complement of special-education services . . . . the IDEA stands for the principle that exclusion is a false economy unbefitting a society committed to the complete integration of its disabled citizens.").

her views or those of the *K.L.* majority.  I think the majority has it right.  I accept that "public education" within the meaning of the IDEA must, indeed, refer to educational opportunities associated with preschool, elementary or secondary school, rather than post-secondary learning.  *See E.R.K.*, 728 F.3d at 988 (citing 20 U.S.C. § 1401(9)); *K.L.*, 907 F.3d at 644 (citing 20 U.S.C. § 1401(34) & (9)(C)).  However, contrary to the view expressed by Judge Lynch, nothing in the IDEA suggests that these educational opportunities can be provided only through traditional public schools.  *See E.R.K.*, 728 F.3d at 990.  Limiting "public education" to instruction provided in state public schools and ignoring adult secondary school completion programs misconstrues the IDEA's purpose by prioritizing the *format* of the education provided over its *content*.  *See E.R.K.*, 728 F.3d at 990 ("Nothing in the IDEA, however, supports the proposition that a program constitutes 'secondary education' or 'free public education' only if it is structurally identical to the ordinary public high school curriculum offered to nondisabled students."); *see also K.L.*, 907 F.3d at 646 ("The fact that some forms of adult education constitute 'transition services' under the IDEA does not remotely suggest that adult education in other forms is not 'public education' within the meaning of the IDEA.").  This is a point stressed by the *K.L.* majority, which reasoned:

> [T]he dissent states, in effect, that it is irrelevant that Rhode Island offers students without disabilities the opportunity to achieve high school diplomas or equivalency diplomas through adult education programs. In our colleague's view, those programs are not "the functional equivalent of secondary school for purposes of the IDEA," and "they do not resemble preschool, elementary school, or secondary school." But in so arguing, the appellees and our colleague turn the IDEA on its head. They rely on language intended to ensure that students with disabilities are provided opportunities to learn in traditional school settings -- from which they routinely had been excluded -- as a rationale for excluding them from non-traditional forms of public education. In other words, depicting IDEA as focused solely on so-called traditional school settings misses the point. The pertinent question is not <u>where </u>public education is provided to students without disabilities who are beyond age 18, but <u>whether </u>it is provided to them in some form.

907 F.3d at 651 (emphasis in the original).[11]

In accordance with these principles, *K.L.* found that adult education programs offered in Rhode Island constituted "public education" within the meaning of the IDEA because their "primary objective" was "to assist students in achieving a secondary-education level of academic competence."  907 F.3d at 650–51.

The Ninth Circuit similarly concluded that adult secondary education programs may constitute "public education" despite their divergence from the curriculum and instruction provided in state public schools, and found that Hawaii's adult education programs constituted "public education" within the meaning of the IDEA because they allowed students to earn high school diplomas.  *See E.R.K.*, 728 F.3d at 990–91.

"Defining 'public education' only as education that is delivered at so-called 'traditional' public schools would significantly curtail the number of students with disabilities—particularly those students ages 18 through 21—who would be entitled to [free appropriate public education] under the IDEA." *K.L.*, 907 F.3d at 644.  Such narrow interpretation of the term "public education" would also conflict with the IDEA's remedial purpose.  *See also Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 372 (1985) ("The [IDEA] was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives."); *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 454 (2d Cir. 2014) (noting the IDEA's "remedial purpose"); *K.L.*, 907 F.3d at 644 (stating that the IDEA is a remedial statute,

---

[11] *See also id.* at 644 n.4 (noting that "IDEA itself emphasizes the need to coordinate its requirements with other local, state, and federal efforts to ensure that 'special education can become a service for [children with disabilities] rather than a place where such children are sent'") (citing 20 U.S.C. § 1400(c)(5)(C)).

which "should be construed broadly to effectuate its purposes") (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

I hold that adult education programs may constitute "public education" within the meaning of the IDEA, provided that such programs possess the three core attributes of "public education" discussed earlier.

**(2) Age Limitations to Public Education in Connecticut**

The Board argues that it need not provide a free appropriate public education to individuals with disabilities between the ages of 21 and 22 because individuals over the age of 21 do not have a right to public education in Connecticut. *See* Def.'s Summ. J. Br., at 16–18.  In support of its position, the Board cites, *inter alia*, Conn. Gen. Stat. § 10-186(a), which provides in relevant part:

> Each local or regional board of education shall furnish, by transportation or otherwise, school accommodations so that each child five years of age and over *and under twenty-one years of age* who is not a graduate of a high school or technical high school may attend a public school . . . (emphasis added).

The Board also points to Conn. Gen. Stat. § 10-220(a), which provides that a local or regional board of education may require a student age 19 or older, and who cannot attain sufficient credits for graduation by the age of 21, to enroll in alternative education program:

> Each local or regional board of education . . . *may* place in an alternative school program or other suitable educational program a pupil enrolling in school who is nineteen years of age or older and *cannot acquire a sufficient number of credits for graduation by age twenty-one* . . . (emphasis added).

These provisions, however, only govern the right of adult individuals to attend or enroll in Connecticut *public schools*.  Because "public education" under the IDEA is not limited to educational

17

opportunities provided by state public schools, the Board's reliance on these provisions to establish an age limitation to public education generally is misplaced.  Even assuming, *arguendo*, that Conn. Gen. Stat. § 10-186(a) and Conn. Gen. Stat. § 10-220(a), in fact, limit the right of individuals over the age of 21 to attend public school,[12] these provisions do not limit the right of  individuals in that age range to complete their secondary education through other programs funded and administered by the state.

Indeed, Conn. Gen. Stat. Sec. 10-220(a) expressly permits local educational agencies to place in alternative education programs individuals who might not be able to acquire the necessary graduation credits before reaching the age of  21.  Such alternative education schools or programs are maintained and operated by local or regional boards of education in accordance with the guidelines established by the Board.  *See* Conn. Gen. Stat. § 10-74j ("[a] local or regional board of education may provide alternative education to students, in accordance with guidelines established by the State Board of Education . . . .").[13]  Under Connecticut law, alternative education schools or programs are "subject to all federal and state laws governing public schools." *Id.*

Separately, Conn. Gen. Stat. § 10-69(a) obliges each local and regional board of education to

---

[12] Furthermore, as noted by Plaintiffs, Conn. Gen. Stat. § 10-186(a)—a provision concerning the duty of local agencies to provide school accommodations, such as transportation, to children under the age of twenty-one—does not affirmatively establish an age limitation to public school education.  *See* Pls.' Opp'n. Br., Doc. 39, at 8. Similarly, the permissive language of Conn. Gen. Stat. Sec. 10-220(a) leaves it to the local board of education to decide whether to enroll in an alternative education program a student who would not be able to graduate by the age of 21, or allow such student to continue attending public school.

[13] Conn. Gen. Stat. § 10-74j defines "alternative education" as follows: "'alternative education' means a school or program maintained and operated by a local or regional board of education that is offered to students in a nontraditional educational setting and addresses the social, emotional, behavioral and academic needs of such students."

"establish and maintain a program of adult classes . . . for its adult residents," including "secondary school completion programs."  The statute provides that each local or regional board of education "may admit an adult to *any* public elementary or secondary school."  *Id.*  Eligibility for such programs is not limited on the basis of age—in fact, the statute defines an adult as "any person seventeen years of age or older."  *See* Conn. Gen. Stat. § 10-67(1).  The Board's own website states that "Sections 10-67 to 10-73(d), inclusive, of the Connecticut General Statutes (C.G.S) require that the adult education services described in this section be provided by local school districts, free of charge, to any adult 17 years of age or older who is not enrolled in a public elementary or secondary school program."[14]  The Board admits that individuals over the age of 21 regularly enroll in Connecticut adult education programs.  *See* DSFO, ¶ 4.

Thus, despite the Board's assertion to the contrary, Connecticut law allows individuals over the age of 21 to pursue secondary education through adult education programs administered by the state.

### (3) Connecticut's Adult Education Programs

#### A.  Overview

Plaintiffs assert that, among adult education programs administered in Connecticut, at least three programs constitute "public education" within the meaning of the IDEA because they are publicly funded, mandated by Connecticut statute and supervised by the state, and allow their enrollees to earn high school diplomas.   These programs include the General Educational

---

[14] *Adult Education Instructional Programs Overview*, Connecticut State Department of Education, https://portal.ct.gov/SDE/Adult-Ed/Adult-Education-Instructional-Programs (last visited May 28, 2020).

Development Program ("GED"), the National External Diploma Program ("NEDP"), and the Adult High School Credit Diploma Program ("AHSCD").  As evident from Connecticut's Statewide Profile Report for 2016—and not disputed by the Board—more than 16,000 adults enrolled in these programs were over the age of 22.  *See* Exh. B to Kim Decl., Doc. 29-5, at 1; *see also* DSFO, ¶ 4.  The Board admits that GED, NEDP, and AHSCD programs allow participants to earn high school diplomas. DSFO, ¶ 5.

### (a)  General Educational Development Program (GED)

GED instructional programs are provided by every local and regional educational agency in Connecticut in order to prepare adults for the GED examination.  *See* Def.'s Resps. to Pls.' 1st Req. For Answers to Interrogs. ("Def.'s Interrogs. Resps."), ¶ 4.  Adults who have not completed high school may take the GED examination and, if they pass the examination, achieve a Connecticut High School Diploma issued by the Board.  *See id.*  To pass the GED examination, an individual must demonstrate the attainment of academic skills and concepts normally acquired through completion of a high school program through a four-part examination which includes a writing sample.  *Id.*  There are no costs or fees to the student taking the GED preparation classes.  *Id.*  Although there is a thirteen-dollar fee to take the GED examination, pursuant to Conn. Gen. Stat. Sec. 10-5(c) the fee may be waived by the state if the student is unable to pay.  *See id.*;  Conn. Gen. Stat. Sec. 10-5(b), (c).

### (b)  Adult High School Credit Diploma Program (AHSCD)

AHSCD programs are provided by local educational agencies or regional educational service centers and allow adults to earn credits toward a high school diploma.  *See* Def.'s Interrogs. Resps., ¶ 6; Conn. Gen. Stat. Sec. 10-69(b), (c).  Each provider can enhance the basic AHSCD program, but

must adhere to the minimum state requirements: (1) use certified teachers and counselors; (2) adhere to State Department of Education requirements regarding assessment, enrollment, accountability, and reporting; (3) meet required credit standards; and (4) ensure that a one credit course offers a minimum of 48 instructional hours.  Def.'s Interrogs. Resps., ¶ 6.  There are no costs or fees to the student seeking the AHSCD.  *Id.*

### (c)  The National External Diploma Program (NEDP)

NEDP is an on-line portfolio assessment program that offers no classroom instruction and requires participating adults to work with an assessor to complete the program.  *See* Def.'s Interrogs. Resps., ¶ 5.  An adult who successfully completes the portfolio assessment is awarded a high school diploma by the providing local educational authority or regional educational service center.  *Id.*  The providing local educational authority or regional educational service center must seek the Board's permission before administering NEDP.  *See* S. Pierson 30(b)(6) Dep., Doc. 38-5, at 47:9–48:20. There are no costs or fees to the student participating in the NEDP.  *See* Def.'s Interrogs. Resps., ¶ 5.

### B.  Whether GED, AHSCD and NEDP Constitute "Public Education" under the IDEA

The Court now examines whether there is any genuine dispute of material fact that GED, NEDP, and AHSCD constitute "public education" under the IDEA.

### (a)  Public Funding

The record is clear—nor does the Board dispute—that Connecticut provides funding for adult education programs administered by local educational agencies, including GED, AHSCD and NEDP.

21

*See, e.g.*, DSFO, ¶ 6; Conn. Gen. Stat. § 10-52 ("A regional district . . . shall be eligible for reimbursements for adult education programs in accordance with sections 10-67 and 10-71."); Conn. Gen. Stat. § 10-71(a) ("Each local or regional board of education or regional educational service center which has submitted an adult education proposal to the State Board of Education pursuant to section 10-71a shall, annually, be eligible to receive, within available appropriations, a state grant based on a percentage of eligible costs for adult education as defined in section 10-67"); Conn. Gen. Stat. § 10-71a ("To be eligible for aid pursuant to section 10-71 or pursuant to requirements of federal law, a local or regional board of education, or a regional educational service center . . . shall, on or before April 15, 1991, and annually thereafter, file with the Commissioner of Education, on such forms as the commissioner shall prescribe, an adult education proposal").

All adult education programs in Connecticut must be provided to students free of tuition or registration fees. *See* Conn. Gen. Stat. § 10-73a(a) ("Tuition or registration fees shall not be charged by any school district to adults enrolled in any adult class or program required under subparagraph (A) of subsection (a) of section 10-69."). The Board's own website confirms that adult education services must be provided by local school districts "free of charge," and that "[l]ocal school districts and other eligible agencies providing mandated adult education programs are reimbursed by the Connecticut State Department of Education on a cost-sharing, sliding scale based on the relative wealth of a district."[15]

As the Board admits, GED, AHSCD and NEDP programs are almost entirely publicly funded. DSFO, ¶ 6. Furthermore, GED, AHSCD and NEDP are administered free of tuition or registration

---

[15] *Adult Education Instructional Programs Overview*, Connecticut State Department of Education, https://portal.ct.gov/SDE/Adult-Ed/Adult-Education-Instructional-Programs (last visited May 28, 2020).

fees. *See* Def.'s Interrogs. Resps., ¶¶ 4–6; S. Pierson 30(b)(6) Dep., at 33:3–11, 46:1–9, 55:15–56:1. While there is a nonrefundable fee of thirteen dollars to take the GED examination, Connecticut covers the fee if a student demonstrates inability to pay. *See* Conn. Gen. Stat. § 10-5(b), (c); Def.'s Interrogs. Resps., ¶ 4.

Additionally, the Board admits that Connecticut receives federal funding for GED, NEDP and AHSCD programs under the Adult Education and Family Literacy Act (AEFLA). *See* Def.'s Interrogs. Resps., ¶ 8; DSFO, ¶ 3. Each year, the Board receives approximately $5 million in federal grants for these programs. *See* Def.'s Interrogs. Resps., ¶ 8 (providing AEFLA grant amounts for years 2013 through 2016).

Thus, there is no genuine dispute that GED, NEDP and AHSCD programs are publicly funded through state and local funds and are free of charge to participating students.

### (b)  State Supervision and Oversight

The Board does not dispute that Connecticut law requires every local educational agency in the state to provide adult education programs to adult residents, including programs of elementary and secondary education. *See* Conn. Gen. Stat. § 10-69(a) ("Each local and regional board of education shall establish and maintain a program of adult classes or shall provide for participation in a program of adult classes for its adult residents . . ."); DSFO, ¶ 2; S. Pierson 30(b)(6) Dep., at 43:4–17.

Although GED, NEDP and AHSCD programs are administered by the local educational agencies, rather than the Board, it cannot be genuinely disputed that the Board supervises and oversees these programs as the educational agency responsible for "general supervision and control"

23

of secondary and adult education in Connecticut. *See* Conn. Gen. Stat. § 10-4(a); *see also* Def.'s

Interrogs. Resps., ¶ 7 (admitting that the Board "supervises" GED, NEDP and AHSCD programs).

Furthermore, Conn. Gen. Stat. § 10-69(d) expressly authorizes the Board to "adopt regulations . . .

to establish standards and procedures governing the awarding of adult education credits . . ."

While the Board does not itself administer the GED examination or provide instructional

courses, high school diplomas awarded upon successful completion of the GED examination are

awarded by the Board. *See* S. Pierson 30(b)(6) Dep. at 51; Def.'s Interrogs. Resps., ¶ 4. Additionally,

the Board has a designated GED program administrator who oversees all GED testing centers in

Connecticut. *See* S. Pierson 30(b)(6) Dep., at 37–38, 40–41. The Board also monitors the local GED

programs by reviewing reports produced by local GED providers. *Id.* at 40–41.

Although high school diplomas awarded upon successful completion of NEDP and AHSCD

programs are issued by the local educational agencies, rather the Board, such diplomas are signed by

the Board and must conform to certain statewide requirements. *See* S. Pierson 30(b)(6) Dep. at 54.

As stated on the Board's website, every local educational agency providing AHSCD program must

ensure compliance with instruction, curriculum and credit requirements established by Conn. Gen.

Stat. § 10-69(b).[16] Similarly, any local educational agency that wishes to offer an NEDP program

must first obtain the Board's approval and ensure compliance with certain requirements, such as

teacher certification. S. Pierson 30(b)(6) Dep., at 47:9–50:12.

Thus, there is no genuine dispute that the Board and the state of Connecticut supervise and

---

[16]*Adult Education Instructional Programs Overview*, Connecticut State Department of Education,
https://portal.ct.gov/SDE/Adult-Ed/Adult-Education-Instructional-Programs (last visited May 28, 2020).

maintain oversight over GED, NEDP and AHSCD programs.

### (c) Objective of Secondary Education

Finally, there can be no genuine dispute that GED, AHSCD and NEDP programs possess the objective of educating students up to the level of academic proficiency associated with the completion of secondary school because adults who successfully complete these programs are awarded high school diplomas. *See* DSFO, ¶5. Adults who successfully pass the GED examination achieve a Connecticut High School Diploma issued by the Board. *See* Def.'s Interrogs. Resps., ¶4. Adults who successfully complete AHSCD and NEDP programs receive adult high school diplomas issued by the providing local educational agency or regional educational service center. *See* Def.'s Interrogs. Resps., ¶¶ 5–6; S. Pierson 30(b)(6) Dep., 53:24–54:13.

Nevertheless, the Board argues that high school diplomas earned through adult education programs, such as GED, AHSCD or NEDP, are not equivalent to traditional public high school diplomas. First, the Board points to 34 C.F.R. § 300.102(a)(3)(iv), an IDEA regulation defining the term "high school diploma," which states that "the term regular high school diploma does not include an alternative degree that is not fully aligned with the State's academic standards, such as a certificate or a general educational development credential (GED)." *See* Def.'s Summ. J. Br., at 19.

This exact argument was rejected by the First Circuit in *K.L.*, which reasoned that adult education programs that award high school diplomas constitute "public education" within the meaning of the IDEA:

> Appellees misconstrue the IDEA regulation. Although an equivalency diploma or other alternative credential may differ in some respects from a regular high school diploma, it does not follow that educational services which help students attain an equivalency diploma are not

"public education." Education is the process by which students attain academic competency, not the document memorializing that process. Indeed, the evident purpose of the regulation is to prohibit states from terminating FAPE services early by bestowing a potentially inferior "general equivalency diploma, certificate of completion, certificate of attendance, or similar lesser credential." 34 C.F.R. § 300.102(a)(3)(iv) (emphasis added). In other words, the regulation is aimed at preventing termination of FAPE services before a student actually demonstrates the level of academic achievement commensurate with receiving a regular high school diploma. This regulation furthers the IDEA's remedial purpose of protecting the educational rights of students with disabilities, an objective at odds with appellees' reliance on it to curtail access to special education services.

907 F.3d at 647.[17]

Second, the Board argues that GED, NEDP, and AHSCD programs cannot constitute "public education" under the IDEA because their curriculum differs greatly from the one provided by Connecticut public schools. *See* Def.'s Summ. J. Br., at 16. The Board argues that because GED, AHSCD and NEDP constitute "very minimal secondary school completion programs,"[18] "adult education in Connecticut does not provide the equivalent of a secondary school public education to general education students." *Id.*

"Nothing in the IDEA, however, supports the proposition that a program constitutes 'secondary education' or 'free public education' only if it is structurally identical to the ordinary public high school curriculum offered to nondisabled students. . . . In light of the variety of specialized secondary education the IDEA makes available to disabled students, it is simply implausible that the phrase 'free public education' in the § 1412(a)(1)(B)(i) exception refers narrowly to a 'conventional' high school curriculum." *E.R.K.*, 728 F.3d at 990–91. In *E.R.K.*, the Ninth Circuit

---

[17] *Accord E.R.K.*, 728 F.3d at 990 n.6 (stating that "[Hawaii's adult education] programs' common characteristic—that they all lead to 'the high school diploma'—is more relevant to their status as 'secondary education' than differences in curriculum, structure, and rigor").

[18] *See* Def.'s Opp'n. Br., Doc. 30, at 3.

found that Hawaii's GED and Competency Based adult education programs constituted "public education" under the IDEA despite offering a curriculum that differed from "'conventional' high school curriculum," because these programs allowed students to earn state high school diplomas. *Id.* at 990 n.6 (noting that "[Hawaii's adult education] programs' common characteristic—that they all lead to 'the high school diploma'—is more relevant to their status as 'secondary education' than differences in curriculum, structure, and rigor").

Similarly, in *K.L.* the First Circuit found that Rhode Island's adult education system, which "provide[d] for the education of students to the level of academic proficiency needed to sit for and pass the GED exam or to complete the National External Diploma Program (NEDP)," constituted public secondary education under the IDEA despite lacking "comparable classroom hours and course credit requirements as the other supposedly traditional public schools." *See* 907 F.3d at 650–51 (internal quotation marks omitted).

Thus, an adult education program that seeks to educate students up to the level of academic proficiency associated with the completion of secondary school constitutes "public education" under the IDEA even if such program does not mirror traditional public school instruction and curriculum. *See K.L.*, 907 F.3d at 650–51; *E.R.K.*, 728 F.3d at 988–89. The lack of a curriculum-based definition of public education is consistent with the overall scheme of the IDEA because the IDEA does not provide "any substantive standard prescribing the level of education to be accorded handicapped children." *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188 (1982).

Applying these principles, there is no genuine factual dispute that GED, AHSCD and NEDP

programs, which seek to educate students up to the level of academic proficiency associated with the completion of grade 12 and allow adults to earn state or local high school diplomas, constitute secondary education under the IDEA.

Because GED, AHSCD, and NEDP are publicly funded through state and local funds, are supervised by the Board, and seek to educate students up to the level of academic proficiency associated with the completion of secondary school, these programs constitute "public education" under the IDEA.

### (4)  Connecticut Violated the IDEA

The record in this case compels the conclusion that Connecticut, as a matter of both law and practice, provides public education to non-disabled individuals over the age of 21.

As long as Connecticut continues to do so, it must also provide a free appropriate public education under the IDEA to disabled students who have not yet obtained the age of 22.  *See E.R.K.*, 728 F.3d at 987 ("[W]e interpret 1412(a)(1)(B)(i) to mean that Hawaii cannot deny special education to disabled students aged 18 through 21 if in fact it provides 'free public education' to nondisabled students in that range of ages.").

It follows that the Board's enforcement of Conn. Gen. Stat. § 10-76d(b) and Conn. Agencies Reg. § 10-76d-1(a)(4), which allow school districts to deny special education to students with disabilities at the end of the school year during which such students reach the age of 21, violates the IDEA.[19]

---

[19] Although the Board disputes Plaintiffs' assertion that no local educational agency in Connecticut provides special education to disabled individuals between the ages of 21 and 22, the Board merely states that it is "not aware of what

### III.  CONCLUSION

For the foregoing reasons, the motion of Defendant Connecticut State Board of Education for summary judgment is DENIED.

The motion of the Plaintiff Class for summary judgment and its demand for class-wide injunctive and declaratory relief pursuant to Rule 23(b)(2) are GRANTED.  Accordingly, the Court GRANTS the following class-wide declaratory and injunctive relief:

(a) DECLARES that the Board's current or future refusal to provide Plaintiff A.R. and the members of the Class a free appropriate public education pursuant to the age limitations established by Conn. Gen. Stat. § 10-76d(b) and Conn. Agencies Reg.§ 10-76d-1(a)(4) violates the IDEA, 20 U.S.C. §§ 1412(a)(1),1407, 1412(11);

(b) ENJOINS the Board from terminating a free appropriate public education as to Plaintiff A.R. and the members of the Class before they reach the age of 22.

**Compensatory Education**

It is necessary, as part of this Conclusion, to consider whether the members of the Plaintiff

---

all the [local educational agencies] do" and offers no evidence whatsoever suggesting that any local educational agency in Connecticut, in fact, continues to provide special education to students that have reached the age of 21. *See* DSFO at ¶ 1.  Furthermore, the Board's representative Mary Jean Schierberl stated that she is "not aware of an LEA continuing a student's services beyond the school year in which the students turn 21."  M. J. Schierberl 30(b)(6) Dep., Doc. 29-4, at 102:21–23.  Importantly, the Board concedes, that "individualized education programs pursuant to the IDEA are not generally available in the adult education programs," despite the existence of adult education programs for non-disabled individuals.  *See* Def.'s Interrog. Resps., ¶ 7.  Because the Board cannot produce any facts that suggest otherwise, there is no genuine dispute that Connecticut fails to provide special education to individuals with disabilities between the ages of 21 and 22 despite providing public education to non-disabled individuals in that age range.  *See BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (noting that a party may not defeat a grant of summary judgment by merely asserting a conclusion "without supplying supporting arguments or facts").

Class should be awarded compensatory education.  The complaint requests the Court to "award compensatory education to members of the Plaintiff Class to the extent they have already been denied a [free appropriate public education] unlawfully."[20]

In any action brought under the IDEA, the court "shall grant such relief as the court determines is appropriate."  *See* 20 U.S.C. § 1415(i)(2)(C).  Such relief must be "appropriate in light of the purpose of the Act."  *See Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015) (citing *Sch. Comm. of Town of Burlington v. Dep't. of Educ. of Mass.*, 471 U.S. 359, 369 (1996) (internal quotation marks omitted)).

Compensatory education is an award of educational services designed to remedy "any earlier deprivations in the child's education."  *See East Lyme Bd. of Educ.*, 790 F.3d at 456 (compensatory education "requir[es] a school district to fund education beyond the expiration of a child's eligibility"); *Brennan v. Reg'l Sch. Dist. No. Bd. of Educ.*, 531 F. Supp. 2d 245, 264–65 (D. Conn. 2008) (compensatory education is "a prospective award of educational services designed to catch-up the student to where he should have been absent the denial of a [free appropriate public education]").  Compensatory education is distinct from an award of damages[21] and constitutes "discretionary, prospective, injunctive relief" that is equitable in nature.  *See Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 523 (D.C.C. 2005);  *Ms. M. ex rel. K.M. v. Portland Sch. Comm.*, 360 F.3d 267, 273–74 (1st Cir. 2004); *G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 309 (4th Cir.

---

[20] Am. Compl. ¶ 51(e).

[21] *See, e.g.*, *East Lyme Bd. of Educ.*, 790 F.3d at 454 (distinguishing between "[a]n award of damages," which is "not available" under the IDEA, and "various forms of retroactive and prospective equitable relief" that are recoverable under the IDEA, "including reimbursement of tuition [and] compensatory education") (internal citations omitted).

2003); *Dervishi v. Stamford Bd. of Educ.*, No. 3:11-cv-01018 (WWE), 2018 WL 8967297, at *14 (D. Conn. Apr. 18, 2018) (quoting *Reid*, 401 F.3d at 524); *East Lyme Bd. of Educ.*, 790 F.3d at 454, 456.

A remedy of compensatory education is generally unavailable to a claimant over the age of twenty-one in the absence of "gross procedural violations" of the IDEA. *See East Lyme Bd. of Educ.*, 790 F.3d at 456 n.15 (citing *Garro v. State of Conn.*, 23 F.3d 734, 737 (2d Cir. 1994)). An "exclusion of the student from school for a substantial period of time" may constitute such gross violation of the IDEA. *See Mrs. C. v. Wheaton*, 916 F.2d 69, 75 (2d Cir.1990) (finding that the plaintiff, who was "completely deprived" of an educational placement until he was 21, stated a claim for compensatory education); *see also Burr by Burr v. Ambach*, 863 F.2d 1071 (2d Cir. 1988) *vacated sub nom. Sobol v. Burr*, 492 U.S. 902 (1989), *reaff'd, Burr by Burr v. Sobol*, 888 F.2d 258 (2d Cir. 1989) (finding that a compensatory education award was appropriate where the student was excluded from school for a substantial period of time).

Following the Ninth Circuit's decision in *E.R.K.*, 728 F.3d at 982, the district court in Hawaii, on remand, found that compensatory education was an appropriate award to remedy Hawaii's systemic denial of a free appropriate public education under the IDEA to individuals with disabilities ages 20 and 21, inclusive. *See* 2014 WL 12887631, at *1–2 (D. Haw. Aug. 22, 2014).

In accordance with this precedent, the Court finds that the Board's systemic denial of a free appropriate public education to individuals with disabilities between the ages of 21 and 22, which has resulted in complete exclusion of such individuals from educational placement, constitutes a gross violation of the IDEA. Therefore, Plaintiffs' demand for compensatory education is GRANTED.

The parties are directed to work together regarding identification and notice to potential class

members, as well as consideration of the Board's ability to provide compensatory education to class

members.  To facilitate this process, the Court will refer the case to a Magistrate Judge.  *See E.R.K.*,

2014 WL 12887631, at *1–2 (ordering the parties to work with a Magistrate Judge regarding issues

such as identification and notice to potential class members, consideration of the state's ability to

provide compensatory education to class members, and identification of potential service providers

likely to be needed to provide compensatory education to class members).

The foregoing is **SO ORDERED**.

Dated:          New Haven, Connecticut
                June 10, 2020

                                                    /s/ Charles S. Haight, Jr.
                                                CHARLES S. HAIGHT, JR.
                                                United States Senior District Judge